Claude GASPARD, Appellant,

v.

**DUPONT DOW ELASTOMERS, L.L.C. and E.I. DuPont de Nemours and Company, Appellee.**

No. 09–03–079 CV.

Court of Appeals of Texas, Beaumont.

Submitted Nov. 20, 2003.

Decided June 30, 2004.

D. Clinton Brasher, Beaumont, for appellant.

M.C. Carrington, Jonathan C. Allen, Patricia D. Chamblin, Mehaffy & Weber, Beaumont, for appellee.

Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

DON BURGESS, Justice.

### STATEMENT OF THE CASE

Claude Gaspard filed suit against Petrocon Engineering, Inc.,[1] Du Pont Dow Elastomers, L.L.C. (DuPont Dow), and E.I. Du Pont de Nemours and Company (DuPont) for injuries sustained while working at the Nordel Unit, located within DuPont Beaumont Works, as an employee of Kellogg Brown & Root. Gaspard claims to have injured his neck, low back, and shoulders lifting rubber bales off a conveyor belt.

The DuPont defendants moved for summary judgment and Gaspard subsequently filed Plaintiff's First Amended Petition. Afterwards, the trial court granted appel-

---

1. Petrocon is not a party on appeal as all claims against Petrocon were dismissed with prejudice.

lees' motion for summary judgment. From that judgment, Gaspard appealed. Following a jurisdictional inquiry from this court, the trial court entered an order containing sufficient language of finality. *See Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 206 (Tex.2001). We reinstated the appeal and having received the parties' supplemental briefs now consider the merits of Gaspard's appeal.

### FACTS

At the Nordel Unit of DuPont's Beaumont Works, Brown & Root employees packaged rubber. Small bits of rubber came down a conveyor system and fell into a weigh hopper. When seventy-five pounds were in the hopper, the rubber was dumped into a compactor and compacted into seventy-five pound bales. There were three compactors, A, B and C, and each had a conveyor line, also A, B and C. A bale traveled down the conveyor and was "popped up" into the wrapper. From there, it went to a loader at the back end where it would be weighed and sent to the warehouse.

On July 27, 1999, one of the compactors jammed. It was determined that a limit switch had broken, shutting down the whole conveyor. This, in turn, necessitated removing a bale of rubber manually. To do so, Gaspard used a bale hook. Gaspard claims that in lifting the bale off the conveyor, he injured his neck, low back, and shoulders.

### CONTROLLING AUTHORITY

Appellees moved for summary judgment on the sole ground that as a matter of law they owed no duty to Gaspard because he was an employee of Brown & Root, an independent contractor. Citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985), appellees contended "[u]nder Texas law, an owner or occupier of land does not have a duty to see that an independent contractor performs its work in a safe manner." Appellees noted the exception to the general rule is that when the general contractor or owner either explicitly retains or actually exercises control over the details of the subcontractor's work, the general contractor or owner will be held liable for the employee's injuries. *See Pollard v. Missouri Pacific R.R.*, 759 S.W.2d 670, 671 (Tex.1988). Appellees claimed summary judgment was proper because they neither expressly retained nor exercised control over the manner of Brown & Root's work.

■ "An owner or occupier of land generally has a duty to use reasonable care to make and keep the premises safe for business invitees." *Clayton W. Williams, Jr. Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997) (citing *Redinger*, 689 S.W.2d at 417). The same duty is owed by a general contractor in control of the premises. *Id.* Accordingly, there is no distinction between DuPont and DuPont Dow in determining the scope of duty.

■ An owner may be liable for negligence in failing to keep the premises safe in two situations: (1) those arising from a defect on the premises, and (2) those arising from an activity on the premises. *Id.* In the first situation, there are two types of premises defects: (a) defects that exist on the premises when the business invitee entered for business purposes or that are created through some means unrelated to the activity of the injured employee or his employer, and (b) defects the independent contractor (or its injured employee) created by its work activity. *Id.*

If the premise defect is of the first type, the owner has a duty to inspect the premises and warn the invitee of those dangerous conditions of which the owner knows or should know. *Id.* If the prem-

ises defect is of the second type, the owner ordinarily has no duty to warn the independent contractor's employees of the dangerous condition because an owner normally has no duty to ensure that an independent contractor performs its work in a safe manner. *Id.* This is also true for the second situation where an owner may be liable, one that arises from an activity on the premises, commonly referred to as "negligent activity." *See Lee Lewis Const., Inc. v. Harrison,* 70 S.W.3d 778, 783 (Tex.2001); *Hanna v. Vastar Resources, Inc.,* 84 S.W.3d 372, 375 (Tex. App.-Beaumont 2002, no pet.).

In the case of either a premises defect created by the independent contractor's work activity or a case involving negligent activity, a duty to exercise reasonable care arises if the general contractor retains control over the independent contractor's work. *See Koch Refining Co. v. Chapa,* 11 S.W.3d 153, 155 (Tex.1999); *Olivo,* 952 S.W.2d at 528. There are two means by which a general contractor can retain the right to control: by contract, or by actual exercise of control. *See Lee Lewis Const.,* 70 S.W.3d at 783. Gaspard does not dispute appellees' claim that Du-Pont did not expressly retain control over Brown & Root's work in the contract. Thus the only means at issue in this case is the actual exercise of control.

"The supervisory control must relate to the activity that actually caused the injury, and grant the owner at least the power to direct the order in which work is to be done or the power to forbid it being done in an unsafe manner." *Coastal Marine Serv. of Tex., Inc. v. Lawrence,* 988 S.W.2d 223, 226 (Tex.1999). The general contractor must have the right to control the means, methods, or details of the independent contractor's work, to the extent that the independent contractor is not entirely free to do the work his own way. *See Elliott–Williams Co., Inc. v. Diaz,* 9 S.W.3d 801, 804 (Tex.1999); *Koch Refining Co.,* 11 S.W.3d at 155–56. It is not enough that the general contractor has the right to order work to stop and start, to inspect progress, or to recommend a safe manner for the independent contractor's employees to perform their work. *See Dow Chemical Co. v. Bright,* 89 S.W.3d 602, 607–08 (Tex.2002); *Lawrence,* 988 S.W.2d at 226. It is not enough that the independent contractor's employees would have taken direction from the general contractor if any had been offered. *Lawrence,* 988 S.W.2d at 226. "A possibility of control is not evidence of a 'right to control' actually retained or exercised." *Id. See also Koch Refining Co.,* 11 S.W.3d at 156.

For the general contractor to be held liable, there must be a nexus between the control exercised and the defective condition or negligent activity that caused the injury. *See Hoechst–Celanese Corp. v. Mendez,* 967 S.W.2d 354, 357 (Tex. 1998); *Olivo,* 952 S.W.2d at 528. Thus, the scope of the duty is limited to the scope of the retained control. *See Mendez,* 967 S.W.2d at 357. "Under this view, an employer who is aware that its contractor routinely ignores applicable federal guidelines and standard company policies related to safety may owe a duty to require corrective measures to be taken or to cancel the contract." *Mendez,* 967 S.W.2d at 357. When a general contractor requires compliance with federal laws, general safety guidelines, and other standard safety precautions, a narrow duty of care arises to ensure that any safety requirements and procedures the contractor promulgated do not unreasonably increase the probability and severity of injury. *Mendez,* 967 S.W.2d at 357–58. *See also Traylor Bros., Inc. v. Garcia,* 49 S.W.3d 430, 435 (Tex.App.-San Antonio 2001, pet.

denied). Further, when the general contractor knew of a dangerous condition before an injury occurred and approved acts that were dangerous and unsafe, actual control was exercised. *See Dow Chemical Co. v. Bright,* 89 S.W.3d at 609.

■■■■ We appraise the trial court's decision to grant appellees' motion for summary judgment in light of all the authority set forth above. The standards for reviewing summary judgment are: (1) the movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and (3) every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985).

## SUMMARY JUDGMENT EVIDENCE

First, however, we must deal with the question of what evidence is properly before this court. Appellees have filed a motion to strike and/or disregard the Appendix to Appellant's Brief in Support of Appeal, the exhibits to Plaintiff's Motion for New Trial, and the exhibits to Plaintiff's Motion for Clarification, and to strike Appellant's Brief and Appellant's Amended and Supplemental Brief on Appeal. In considering whether a trial court erred in granting summary judgment, we look only to the evidence that was considered by the trial court. *See Risner v. McDonald's Corp.,* 18 S.W.3d 903, 909 (Tex.App.-Beaumont 2000, pet. denied). To the extent appellees' motion requests we disregard evidence that was not before the trial

court, it is granted. We do not find it necessary to strike appellant's briefs and to that extent the motion is denied.

Appellees' summary judgment evidence consists of the contract between DuPont and Brown & Root (Exhibit A); excerpts from Gaspard's deposition (Exhibit B); and excerpts from Michael Reeder's deposition (Exhibit C). In their Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, appellees did not attach any additional summary judgment evidence, nor did they refer to any other evidence.

Gaspard's response to appellees' motion for summary judgment contained five exhibits: Exhibit A—Plaintiff's Original Petition; Exhibit B—Deposition Excerpts of Rodney Touchet; Exhibit C—Deposition Excerpts of Claude Gaspard[2]; Exhibit D—Deposition Excerpts of Rick Brown; and Exhibit E—Deposition Excerpts of Mike Reeder.

There is some overlap of the summary judgment evidence. Accordingly, we will summarize the evidence per each deposition.

### *Claude Gaspard*

Gaspard went to work at DuPont Beaumont Works when Beaumont Distribution had the contract. Gaspard hired on with Beaumont Distribution under the job title "auxiliary" in the Nordel Unit, packaging rubber. At the time, the Nordel Unit was owned by DuPont. Two to three years later, Brown & Root acquired the contract and Gaspard then worked for them. At the time Gaspard sustained his injury, in July of 1999, DuPont Dow was the owner of the unit.

---

**2.** Gaspard's response incorrectly identifies Exhibit B as excerpts from Gaspard's deposition and Exhibit C as excerpts from Touchet's deposition.

When Gaspard hired on with Beaumont Distribution, he received training from Du-Pont. Gaspard said, "All of our training came from Dupont." According to Gaspard, training was done in stages, called task verifications, "where you would—they would go through with a Dupont trainer and a Dupont safety guy and go over each individual job with you, see that you knew that job. And then it had to be signed off by a series of people: Operator, all the way down to the Dupont training supervisor." Gaspard agreed "that Dupont would train you on every potential job that you would have in the Nordel Unit ... And Dupont would train you with respect to the machinery that was there and what you would do if the machinery broke down, if there was a backup."

Gaspard agreed that Chris Ardoin[3] would be considered the project superintendent. Gaspard further agreed that he went back to shift supervisor when Brown & Root took over the contract, and that with Beaumont Distribution he had some responsibility for scheduling, which held true when Brown & Root took over. Gaspard said, "to the nature to where if we needed overtime—or ... if someone didn't show up, yes, you had to get in the overtime book and get somebody out there." Gaspard agreed that Gary Leidecker[4] and Ardoin had responsibility for staffing the Nordel unit, and stated that Leidecker did "a lot of overtime scheduling. Matter of fact, ... he took total control over all overtime, all the scheduling for overtime." Gaspard said DuPont set the production standard and they indicated how much product needed to be produced. DuPont

then relayed that to either the process operator or Chris Ardoin.

Gaspard revealed some safety topics "[t]hey talked about" were gun safety around hunting season, scaffolding, setting up a stepladder, and personal protective equipment. Neither Gaspard nor counsel identified whether "they" were DuPont or Brown & Root. Counsel asked, "And then other topics would be as—as small as the proper lifting techniques; correct?" Gaspard replied, "Yes" and went onto say, "The ergonomics of lifting was one of the—one of a series of the Dupont tapes."

Gaspard received training in Lotus from DuPont. Counsel asked Gaspard, "If you had a complaint regarding the lack of staffing, not having enough folks out there at the Nordel Unit, would you go complain to Mr. Leidecker?" Gaspard replied, "Well, they were kind of new, you know.... So, we really—we pretty much just met head to head with Dupont, with Robinson, Gilbert, you know. Pretty much—Gilbert was the contract administrator."[5]

Gaspard was asked who was on his crew during the shift when the accident occurred. Gaspard answered, "It was John Nellis, supervisor; myself; Fred Merchant; Richard Schlesinger; Pat Guillory; Warren Guillory and Ricky Williams." Gaspard also said Mike Reeder[6] came down to the packaging area. Gaspard was asked, "what happened that caused your injury" and he said they were "running 2722, which is one of the fastest rubber types." According to Gaspard, the conveyors, particularly the A/B conveyor, had

---

**3.** The summary judgment evidence does not establish who employed Ardoin.

**4.** Leidecker was employed by Brown & Root.

**5.** Exhibit B of Gaspard's response to appellees' motion for summary judgment contains

deposition testimony from Rodney Touchet. According to Touchet, F.B. Robinson, the plant supervisor, and Daryl Gilbert both worked for DuPont.

**6.** Reeder was employed by DuPont.

occasion to jam up and then they were stopped. Gaspard said it was "[b]ecause it's the only line that the two conjoin, you know, together. C side's its own independent system going to the wrapper." Gaspard described it as,

> it's a press. It presses it into a 75–pound bale. It comes out of the compactor, kicks it out on to the conveyance system. Sometimes they kick out simultaneously. That's when you got a problem, if they are, you know, together, because it overloads everything. And it goes down a conveyor, and then a pop-up pops it up and shoots it into the wrapper. It has to be wrapped first before it goes to a loader. The loader is way back in the back end.

When the compactor jammed, Gaspard was alone on the front end. He paged the DuPont control operator and told them he had a jam on A line. Mike Reeder apparently heard the page and came down to the packaging area and called EC.[7] EC had to come from the electrical shop across the street and man the problem. Gaspard was not certain but thought Ed Myers[8] was the board operator that night for DuPont. Gaspard told Myers "he had problems, . . . maybe he needed to bottle up because we're losing a lot of prime rubber in reclaim boxes." While this was taking place, Gaspard was having to man the divert-box station while trying to unjam the line until help got there. To divert rubber from the compactor straight into the scrap box, Gaspard "would have to physically bend down, put the box under there, the rubber drops down," and the forklift picks it out. Fred came over and was helping Gaspard get everything back in line because, Gaspard said, "I couldn't change all the divert boxes, put liners in them and try to get this compactor, you

know, unjammed." Gaspard stated, "Once I got the compactor unjammed, you know, everything had slowed down because EC was there; and Mike Reeder was there. And they—when Mike got there, then the operator bottled up." Gaspard said the conveyor had backed up in the past and he previously had to unjam the compactor. Gaspard said you had to use the bale hook. "There's no other way to do it. No other way physically. There's so much machinery around there. The last thing you want to do is put your hands under them moving conveyors." Neither Schlesinger, Williams, or Guillory were in the area. They did not assist in packaging. Gaspard spoke to Reeder that night. Reeder asked Gaspard what was the problem. Gaspard said, " 'The A compactor is jammed up. I can't figure out what the deal is. I can't figure it out. I've—I've done it manually, you know, from the manual controls; and I can't get it to unlock.' So that's when he called EC; and I think they found that a limit switch had broke underneath one of the conveying lines, to shut down the whole conveyor. When that happens, it shuts the compactor down." Gaspard said, "if this bale don't cross by a certain amount of times in the PLC room, it tells this compactor to stop or you're going to start jamming bales. And that PLC switch, the limit switch, had broken. So it stopped that bale." Gaspard said within two minutes of feeling pain in his back, he told the supervisor, John Nellis.

The bale hooks were made by DuPont maintenance. "[W]e put in a procedure when two employees within an hour and a half apart lost their fingers. One lost two fingers. The other one lost one finger reaching on to a conveyer [sic] that was deenergized." "[T]herefore, we put in a

---

7. EC refers to electrical mechanics employed by DuPont.

8. The summary judgment evidence does not establish who employed Myers.

procedure that no one was to reach over a moving conveyor or a deenergized conveyer [sic] with their hands. They had to use a stainless steel bale hook." Gaspard said DuPont supervision developed the policy on no hands over the conveyor. This occurred in the transitional period from Beaumont Distribution to Brown & Root.

### Mike Reeder

Appellees rely on Reeder's deposition in asserting:

> There is no evidence that any of the defendants' employees directly supervised the plaintiff's work. At most, the defendants' employees controlled the general production operation at the Nordel unit. None of the defendants' employees controlled the packaging duties of Brown & Root. Defendants' employees were present at the Nordel unit only to inspect the progress of the production and determine if the production specifications were being followed.

In the excerpts from Reeder's deposition, he stated that Rick Brown, Sabrina Greer, and Andy Nguen worked in the same area as the Brown & Root employees. They were operators who worked for Petrocon at the Nordel unit. Petrocon no longer provided operators at the DuPont Beaumont Works.

Reeder was questioned on who supervised the Brown & Root employees. Reeder said they were supervised by a first line supervisor on each shift, employed by Brown & Root, and guessed they reported to a Brown & Root employee at the superintendent level. Reeder said, "No" when asked if "[a]nybody else supervise[d] Brown & Root employees at the Nordel unit?" Reeder said it was the role of the Brown & Root front line supervisor "[t]o tell the—the Brown & Root people working in the packaging room what to do specifically." When asked if

the Brown & Root front line supervisor ever reported to him, Reeder replied, "Not directly, no." Reeder was also asked, "Do you know whether or not the Brown & Root front line supervisor ever reports to any DuPont employee at all?" but the next page of the deposition was not included in appellees' summary judgment evidence.

Gaspard's response includes excerpts from Reeder's deposition in addition to those attached to appellees' motion for summary judgment. That evidence is summarized as follows. Reeder testified prior to the 1990's those working in the packaging area had always been DuPont employees. The first contractor to come into the packaging area at the Nordel Unit was Beaumont Distribution Company (BDC). When BDC first came in, they only took over "a couple of jobs." DuPont employees manned the remaining positions. At some point in time the contractors assumed responsibility for the entire area. The DuPont employees who had been working in that area were promoted to or took other jobs.

Brown & Root employed a first line supervisor for each shift. Reeder guessed Brown & Root also had an employee at the superintendent level to whom Brown & Root employees reported. According to Reeder, no one else supervised Brown & Root employees at the Nordel unit. Reeder testified, "It wasn't my role to tell [Brown & Root employees] what to do." He said it was the role of the Brown & Root front line supervisor "[t]o tell the— the Brown & Root people working in the packaging room what to do specifically." The Brown & Root front line supervisor did not directly report to Reeder. Reeder stated the Brown & Root front line supervisor "got direction in terms of packaging needs, production goals from DuPont people." DuPont provided training to contractors working in the Nordel unit. After

the transition period between DuPont auxiliarymen and contractor auxiliarymen, DuPont's role in training decreased but was not nonexistent; DuPont provided training material and overview training. If equipment broke, the Brown & Root employee would normally go to the package room operator, a DuPont employee or Petrocon operator. DuPont management set production goals. They made several different types of rubber, and "production goals" referred to the "number in pounds and how to package it for that particular campaign. So there would need to be some communication as to we need so many pounds packaged one way and so many pounds packaged another way so you could keep up with when to change packaging materials." The production goals changed approximately every two weeks. The type changes were discussed in morning meetings and when there was a type change, "goal sheets" were issued. Those meetings included the area superintendents and the first line supervisors. According to Reeder, they did not "specifically" ever set a goal for how many pounds to package in a shift. Reeder denied there were any quotas set for packaging on a shift but admitted "we might have talked about, you know, making a number of pounds." Reeder testified he would not get in trouble for a "bad shift", meaning a low number of pounds were packaged, and neither would the contractors.

Reeder testified DuPont conducted the safety meetings and DuPont employees attended with the others. Safety meetings occurred once a month.

If there was a problem in the packaging room, Reeder would try to resolve it if he thought he could. The contractors relied on DuPont employees to help resolve problems. Each shift had electrical mechanics and general maintenance mechanics employed by DuPont who helped troubleshoot along with the operators and contractors.

Counsel quoted an e-mail from Gary Leidecker about bale hooks as stating, " 'It's been brought to my attention that B&R folks may not be using the bale hooks to move the bales. Rather we are moving with our hands which expose us to a hand injury.' " Counsel further says, "He goes on to talk about hand injuries, and he tries to encourage people to use the hooks." Reeder said a bale hook would be used to straighten out a bale if it turned sideways and jammed up on the conveyor. Reeder testified that if the bale was oversized and would not fit into the wrapper, it had to be removed from the conveyor belt with the bale hook.

Reeder testified that as far as he knew, if a bale had to be removed from the conveyor belt, employees "could use their hands or they could use the bale hook or whatever they thought was the—the best way to do it." Leidecker's e-mail was sent to Elvis Collier, Claude Gaspard, and Danny Wright, all of whom are Brown & Root employees. When asked if he knew of any reason why Leidecker would tell them to use the hooks, Reeder responded, "He thought it was safer apparently." Reeder did not know whether or not DuPont instructed employees to use the bale hook to remove bales off the conveyor belt. Reeder said he thought DuPont maintenance people made the hooks. Reeder did not recall ever hearing any instruction given to Brown & Root employees by DuPont to use bale hooks for removing bales from the conveyor belt.

### Rodney Touchet

Touchet was asked if what happened to Gaspard had happened to him. Touchet stated, "Many times it happened to me, because they will—they'll run so fast—they run the rates so fast." Touchet said

he would tell the operator in the control room to slow down, that someone was going to get hurt, but the operator would say, "Stop crying." The control room operator worked for DuPont. Touchet agreed the problem Gaspard described happened on more than once occasion. Touchet said, "if they run the rates normal, it wouldn't happen. The compactors would keep up. But when they would run the rates so fast, 'A' compactor cannot keep up, because it has a hydraulic leak the majority of the time." Touchet agreed it happened when they were running the rates too high and that was the main cause of the problem. Touchet said the rate was set by F.B. Robinson, the plant supervisor, and Daryl Gilbert, who both worked for DuPont. Touchet said he told his packing room operator that running the rates too high could cause someone to get hurt. Touchet identified the packing room operator as, "[t]hat was Petrocon," specifically Larry Price and, subsequently, Shane Peoples. Touchet said he told Peoples "the majority of the time, '[t]ell Wayne to cut back, because he's fixing to have a plug. Plus the 'A' compactor cannot keep up,' because he knew that compactor had a—a serious leak—hydraulic leak, because it—you know, the cylinder wasn't holding the pressure to push them—them bales out." Touchet said Peoples would tell Wayne to cut back and Wayne would respond, "There you go again with that crying." Touchet said "nothing would get done until everything got plugged." Touchet said the next day he asked Robinson and Gilbert, "Why is Wayne wanting to run all that rubber fast like that, because the—the compactors can't keep up?" They had no comment. Touchet told Robinson that running at a high rate could cause someone to get hurt and Robinson replied, "Well, as long as y'all watch the conveyors, then they won't get—nobody will get hurt." Touchet said, "Well, how could you

watch something when 'A' compact is—is messing up frequency [sic]—you know, every—every 30 minutes to an hour, you got a bale that's twice the size, or two bales going into one; and you got to fight it with a hook to get it out." Touchet said "he could have bottled up and then wait until that compactor catch up and go back to it" but Wayne would not do it. It was Touchet's opinion that the Petrocon people and the DuPont people knew that running rates so high could lead to someone getting hurt. Touchet said there was another day when the rates were running extremely high, and two people got their fingers cut off. A bale got jammed up and Robert Hillhouse grabbed it; "and it cut both of his fingers." Touchet thought the root cause was the rates were going too fast. Within 35 to 40 minutes, Danny Wright had his fingers cut off on the same conveyor. Touchet said the line should have been shut down and investigated after Hillhouse's accident but it was not. Touchet agreed there was pressure "to keep the rubber packaging as fast as you can." Touchet felt that way because "if you didn't do what they said, you wasn't going to have a job. They kept pressuring you—'You know, we can always replace you.'" Touchet said if the compactors get behind, you push a button and the rubber goes down another chute, bypassing the compactor, and into the divert box, a 900–pound box. In answer to a question about who was in the packaging room, Touchet stated, "Not Petrocon, not duPont. They're never around. You can't find them. . . . Sometimes I had to beat on—knock on the window (indicating) to wake them up, because they're sleeping in the control room." Touchet was told by Robinson not to divert, to "make more bales." According to Touchet, there was a price difference, what went in the divert box was about three cents a pound. Touchet was also aware that Jimmy Tezeno was hurt

working in the packaging room, similarly to Wright and Hillhouse. Touchet said his shoulder was pulled out of socket because "they were running so much rates. We were—had to go to the dead—you know, to the dead lift; and it was broke."

Touchet said the majority of mechanical problems were with the compactors and the robots. The compactors had hydraulic leaks. On the conveyors the chain would break and it would have to be shut but "they was still running the rates." "A" loader was always locked out because of hydraulic leaks. The "B" robot was not in "that good of a shape to control the rates." The "A" compactor had a constant hydraulic leak and "they wouldn't fix it." Petrocon and DuPont knew about the problems with the "A" compactor because Touchet told them. According to Touchet, Petrocon was the one over the packaging room and there was not a DuPont operator in the packaging area.

Touchet was asked, "Did they teach you to obtain assistance when you did not feel that you could lift a particular object safely?" He answered, "That's why you had the hooks."

*Rick Brown*

Rick Brown said he was hired by Petrocon. "All training and—once I started, I was treated just like a duPont employee." Brown said no one from Petrocon ever told him how to be a packaging room operator, that DuPont people instructed him. Brown said it was a DuPont employee who did the training.

ANALYSIS

■ Gaspard contends the trial court erred in granting summary judgment because this is not a negligent activity case, but a premises defect case, the type involving defects the independent contractor or its employee created by its work activity.

In *Dow Chemical Co. v. Bright,* 89 S.W.3d at 605, a premises defect case, the "defect" was an unstable overhead pipe that fell on Bright. The pipe had been put in place by the independent contractor, Bright's employer. The court found Dow did not owe Bright a duty based on the lack of right to control. *See also Elliott–Williams Co.,* 9 S.W.3d at 802–803 (panels installed by independent contractor fell on employee of another independent contractor); *Olivo,* 952 S.W.2d at 526–527 (independent contractor's employee fell off a catwalk and landed on a drill pipe thread protector left on the ground during previous shift when independent contractor was in control of premises).

In this case, Gaspard's pleadings and summary judgment evidence establish the injury occurred when he manually removed the bale. The injury did not occur when the compactor jammed or when the conveyor shut down. Accordingly, we find this case does not involve a premises defect.

■ Moreover, as noted in our discussion of the controlling authority, whether it is a premises defect of the type Gaspard claims, or a case of negligent activity, a duty to exercise reasonable care arises based on the "right to control." *See Koch Refining Co.,* 11 S.W.3d at 155; *Olivo,* 952 S.W.2d at 528. And that "right to control" must relate to the activity that caused the injury. *See Lawrence,* 988 S.W.2d at 226. There is no summary judgment evidence that DuPont retained the right to direct the method Brown & Root employees utilized when manually removing rubber bales from the conveyor. We therefore find there is not a material fact issue as to whether appellees owed a duty to Gaspard. Issues one and three are overruled.

Gaspard further maintains he made "general claims of negligence against the

operators of the unit based on a duty to use ordinary care." Gaspard argues his case against DuPont "does not sound in premises liability, but ordinary negligence," based on a distinction between DuPont Dow and DuPont, who supplied operators to run the unit. As the authorities discussed above indicate, there is no distinction for purposes of this case between an owner or occupier of the premises and a general contractor in control of the premises, the issue remains whether the supervisory control related to the activity that caused the injury. *See Wal–Mart Stores, Inc. v. Renteria,* 52 S.W.3d 848, 851 (Tex. App.-San Antonio 2001, pet. denied) (Because there was no evidence Wal–Mart exercised any control over the lighting of the corn roaster, which was the activity that actually caused the injury, there was no evidence to support a deemed finding of right to control). *See also Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 23 (Tex.1993) (Issue was not whether Exxon had the right to control Morgan in the details of the work to be performed in operating the service station, but whether Exxon had the right to control the alleged security defects that led to Tidwell's injury). *See generally Hagins v. E–Z Mart Stores, Inc.,* 128 S.W.3d 383, 388–89 (Tex.App.-Texarkana 2004, no pet) (Plaintiff was not entitled to a jury question on control that asked, "Did E–Z Mart Stores, Inc. exercise or retain some control over the manner in which the work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports?" because the retention of control must relate to the activity that actually caused the injury).

Gaspard's complaint against the operators is that they ran the rubber too high. However, as noted above, the injury did not occur while the rubber was being run. The operation had ceased when Gaspard moved the stationary rubber bale, causing his injury. Issue two is overruled.

Gaspard claims a fact issues remains as to whether appellees' alleged breach of OSHA regulations was a proximate cause of his injuries. Gaspard argues that DuPont's institution "of the bale hook method was negligent and against the standards established by OSHA and other proper lifting regulations." All Gaspard's references to the record are to evidence that was not before the trial court when summary judgment was granted, and therefore is not before this court on appeal. In the evidence that is before this court is the contract between appellees and Gaspard's employer, Brown & Root. It provides that "Brown & Root shall: (a) comply with all federal, state, and local regulations . . . ." Furthermore, the summary judgment evidence set forth above establishes that Brown & Root's employee and Gaspard's supervisor, Gary Leidecker, directed Brown & Root employees to use the bale hooks rather than their hands. There is no evidence that appellees were responsible for ensuring Brown & Root employees complied with OSHA regulations. Moreover, the evidence establishes that the decision to use bale hooks, which may have been made prior to Brown & Root's stint at the Nordel Unit, was adopted and endorsed by Brown & Root for its employees. Issue four is overruled.

Lastly, Gaspard claims appellees received too much relief. Gaspard argues appellees motion for summary judgment did not challenge "a duty to use ordinary care as related to a negligence cause of action, and a duty to inspect their premises and warn of defects on their premises. Nor do they address why their actions did not constitute negligence per se pursuant to their violation of OSHA . . . ." As our discussions above indicate, this is not a case of premises defect but of negligent

activity, and the summary judgment evidence established Brown & Root was contractually obligated to comply with OSHA. The summary judgment evidence further established no duty arose from appellees' right to control as any retained control did not relate to the activity that actually caused the injury.

Gaspard also argues that appellees have failed to distinguish the claims against DuPont and DuPont Dow. As we noted above, because this is a case of negligent activity, in order for their to be a duty owed by either DuPont or DuPont Dow, the supervisory control must relate to the activity that actually caused the injury. The summary judgment evidence establishes this is not the case. Gaspard's complaint is without merit. Issue five is overruled.

The judgment of the trial court is AFFIRMED.