**TRAYLOR BROS., INC., Appellant,**

**v.**

**Simona R. GARCIA, Administrator of the Estate of Elva Garcia Alaniz; Elias Alaniz, as Representative of the Estate of Flavio Flores Alaniz; Simona R. Garcia, as Next Friend of Elizabeth Alaniz, Edith Alaniz, and Flavio Flores Alaniz Jr., Minor Children; and Eladio Alaniz, as Guardian of the Estate of Elizabeth Alaniz, Edith Alaniz, and Flavio Alaniz Jr., Minor Children, Appellees.**

No. 04–97–00179–CV.

Court of Appeals of Texas, San Antonio.

Feb. 28, 2001.

Rehearing En Banc Overruled June 1, 2001.

---

Ana Lisa Garza, Law Offices of Ana Lisa Garza, Rio Grande City, Andrew T. McKinney, IV, Kim A. Cooper, McKinney & Cooper, L.L.P., Houston, for Appellant.

Craig S. Smith, Donald B. Edwards, Smith & Edwards, Corpus Christi, Ramon Garcia, Catherine W. Smith, Felipe Garcia, Jr., Law Office of Baldemar Garza, P.C., Edinburg, Baldemar Garza, Law Office of Baldemar Garza, Rio Grande City, David C. Garza, Garza & Garza, L.L.P., Brownsville, Thomas H. Crofts, Jr., Crofts, Callaway & Jefferson, P.C., San Antonio, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, ALMA L. LÓPEZ, Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, FRANK EVANS, Justice,[1] AUSTIN McCLOUD, Justice.[2]

## OPINION ON APPELLANT'S MOTION FOR REHEARING EN BANC

TOM RICKHOFF, Justice.

Traylor Brothers' motion for rehearing *en banc* is granted. Because a majority of the justices of the en banc court could not agree on a judgment, that fact was certified to the Chief Justice of the Texas Supreme Court. *See* TEX.R.APP.P. 41.2(b). The Chief Justice of the Texas Supreme Court appointed two visiting judges to sit with the court to consider the case. *See id.*

This court's opinion and judgment dated January 13, 1999 are withdrawn, and this opinion and judgment are substituted.

Flavio Alaniz, Sr. ("Alaniz") was killed when a highly-intoxicated driver plowed into a flashing "arrow board" attached directly to his crew's work truck on a Houston highway project. The question before us is whether the project's general contractor, Traylor Brothers, Inc. ("Traylor"), owed a duty to Alaniz. Because we hold that no duty arose under the facts as presented, we reverse the trial court's judgment and render judgment in favor of Traylor. We do not address any of Traylor's other issues because they are not

necessary to the final disposition of this appeal. *See* TEX.R.APP.P. 47.1.

### FACTS

Traylor was the general contractor on a $45 million project to widen and expand the U.S. 59 Southwest Freeway in Houston, Texas. Traylor and Paige Barricades, Inc. ("Paige") entered into a subcontract pursuant to which Paige agreed to perform certain work. This work included the application of both temporary and permanent raised pavement markers.

On the night Alaniz was killed, he and four co-workers drove a Paige truck to Traylor's lot to borrow an arrow board. The testimony was conflicting as to whether a Traylor employee was present when the Paige employees picked up the arrow board. Vicente Garcia ("Garcia"), the "head man" of the crew,[3] testified that he did not see a Traylor employee, but Jerry Williams ("Williams"), Traylor's traffic superintendent, testified that he was present when the Paige employees borrowed the arrow board. In any event, the arrow board was checked to ensure that it was functioning properly and was connected directly to the Paige truck.

After finishing one project, the five-member crew was sent to an area along the access road where they were to perform maintenance on temporary pavement markers. The maintenance work, which was done pursuant to a "barricade report" from the Texas Department of Transportation, involved driving along the access road and replacing any temporary markers that were loose or missing. One worker, carry-

---

1. Assigned to this case by the Chief Justice of the Texas Supreme Court.

2. Assigned to this case by the Chief Justice of the Texas Supreme Court.

3. Garcia was designated as the "head man" of the crew because he was the only member of the crew who understood English and could communicate with William Van Buren, who was employed by Paige as the crew's supervisor. Garcia was Alaniz's brother-in-law.

ing hot plastic adhesive in a coffee can, would pour a patch of adhesive in an appropriate place, while another worker would place the marker. The adhesive, called thermoplastic, had to be heated to 350 degrees in a sizeable furnace that was kept in the back of the Paige truck. This hot adhesive was dispensed through a spigot on the side of the furnace. Boxes of the markers were also located in the back of the same truck.

As four of the crew members were performing this maintenance work, Garcia would follow in the Paige truck with the arrow board attached. The truck with the arrow board attached was the only truck involved in the moving lane closure. The truck was used both as the work truck and to pull the arrow board. This resulted in a "rolling closure" of the lane in which the crew was working. The Paige truck would move forward at the crew's pace, leaving the lane behind the arrow board and in front of the crew open to traffic.

At the time the crew was performing the maintenance work, the lanes on U.S. 59 were closed, and traffic was being diverted to the access road. The crew was working in an area in which the far left lane of the access road was permanently closed through the use of barrels. The crew was working in the middle lane, and the far right lane was open to traffic. The speed limit was 35 mph. One crew member testified that the traffic was between light and heavy. Williams testified that traffic was light. Garcia testified that on average one car would pass the crew every ten seconds. Shannon Hiller Hopkins, the vice president of Paige, testified that a car coming by every ten seconds would be considered light traffic.

The crew had been performing the maintenance work for a few minutes. At approximately 11:30 p.m., Garcia had stopped the Paige truck and was putting more adhesive in the furnace. Two men were working in front of the truck. The other crew member was getting markers out of the truck, and Alaniz was refilling the adhesive in the coffee can he was using. Garcia and the other crew member were standing to the back of the truck on the driver's side. Alaniz was standing in back of the truck on the traffic side of the trailer tow bar.

James Calvary, who was highly-intoxicated, was driving approximately 55 miles per hour when he hit the arrow board. A few seconds before the accident, a member of the crew saw Calvary's truck and shouted a warning to the other crew members. Garcia saw Alaniz attempting to jump over the tow bar of the trailer; however, when Calvary struck the arrow board, the cage covering the generator swung forward and hit Alaniz, causing him to fall forward and hit his head on the tailgate of the truck. The medical examiner testified that Alaniz would have been rendered unconscious by the impact, and Alaniz was pronounced dead at the scene of the accident.

After Calvary's truck shuddered to a halt, Calvary apparently got out, saw Alaniz dead or dying, and limped away in his truck. Calvary was arrested while trying to convince a wrecker driver to tow his truck without calling the police. Calvary was later convicted of intoxication manslaughter in the incident.

Alaniz's survivors brought suit against Calvary, the manufacturer of the arrow board, Paige and Traylor. All of the defendants except Traylor settled before trial. The trial court entered judgment against Traylor based on a jury's verdict, awarding the appellees $12,152,730.43 in damages. Traylor timely appealed.

## THE QUESTION OF DUTY

### 1. The Legal Standard

The threshold inquiry in a negligence case is duty. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987). The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex.1996); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990).

Normally, a general contractor does not have a duty to ensure that an independent contractor performs work safely. *See Elliott–Williams Co., Inc. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999); *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985); *Laurel v. Herschap*, 5 S.W.3d 799, 802 (Tex.App.—San Antonio 1999, no pet.). However, a duty may arise if the general contractor retains some control over the manner in which an independent contractor performs its work. *See Elliott–Williams Co., Inc. v. Diaz*, 9 S.W.3d at 803; *Laurel v. Herschap*, 5 S.W.3d at 802. The right of control can arise either through a contractual obligation or through the actual exercise of control. *Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex.1999); *Elliott–Williams Co., Inc. v. Diaz*, 9 S.W.3d at 804. If the right of control has a contractual basis, the general contractor's failure to exercise control will not absolve the general contractor of liability. *Elliott–Williams Co., Inc. v. Diaz*, 9 S.W.3d at 804. "It is the right of control, and not the actual exercise of control, which gives rise to a duty to see that an independent contractor performs work in a safe manner." *Id.*

A general contractor will only be liable for an independent contractor's acts if it has the right to control "the means, methods, or details of the independent contractor's work." *Id.* "[M]erely exercising or retaining a general right to recommend a safe manner for the independent contractor's employees to perform their work is not enough to subject the [general contractor] to liability." *Koch Refining Co. v. Chapa*, 11 S.W.3d at 155. "To be liable, the general contractor's role must be more than a general right to order the work to start or stop, to inspect progress or receive reports." *Laurel v. Herschap*, 5 S.W.3d at 802. Furthermore, "the control must relate to the injury the negligence causes." *Elliott–Williams Co., Inc. v. Diaz*, 9 S.W.3d at 804. As outlined by the Restatement (Second) of Torts:

> [T]he employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965).

### 2. Traylor's Traffic Control Duties

Appellees argue that Traylor can be held liable based on its traffic control duties. We reject this argument. Traylor did not have a contractual right to control Paige's rolling lane closures, and there is no evidence that Traylor actually exercised control over the manner in which Paige conducted its rolling lane closures. The only evidence of Traylor's involvement in the rolling lane closures was its informal agreement with Paige that Paige could borrow Traylor's arrow boards as needed. There is no evidence that Traylor had a

contractual right to control the manner in which Paige used the borrowed arrow boards or that Traylor actually exercised control over the manner in which they were used. Williams's testimony that he was present when Paige employees connected the arrow board to the work truck is not evidence of any exercise of control.

 Conduct of the parties which indicates the construction that the parties themselves place on the contract may be considered in determining the parties' true intent. *Consol. Eng'g Co. v. Southern Steel Co.*, 699 S.W.2d 188, 192–193 (Tex. 1985). Evidence with reference to the control that was actually exercised is relevant and admissible as tending to prove what the contract really contemplated. *Newspapers Inc. v. Love*, 380 S.W.2d 582, 589 (Tex.1964).

In the contractor-subcontractor agreement, Traylor delegated to Paige the duty to "furnish all labor, materials, equipment, supervision" relevant to pavement markings. Maintaining the temporary markings on the traveled roadway was clearly Paige's job, and this job could not be done without closing a lane on at least a temporary basis. Indeed, testimony indicates that Paige was working in the area that night not at Traylor's direction, but according to a "barricade report" issued by the Texas Department of Transportation. The inescapable inference is that the parties' contract called for Paige to conduct those rolling lane closures which were a necessary part of its temporary marker maintenance duties.

### 3. The *Mendez* Duty

If Traylor is to be held legally liable, its negligence must involve its failure to intervene when Paige borrowed its arrow board and hooked it directly to the Paige truck.[4] Such a duty would only exist if Traylor was aware that Paige routinely ignored applicable safety guidelines in connecting the arrow board directly to the work truck. *See Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex.1998); *Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469 (Tex. 1985).

In *Hoechst–Celanese Corp. v. Mendez*, the issue before the court was: "What is an employer's duty to an independent contractor's employees when the employer requires the contractor to observe general workplace safety guidelines." 967 S.W.2d at 355. The court found that if a contractor requires a subcontractor to comply with its safety regulations, the contractor owes a narrow duty of care—that is, that its safety requirements and procedures do not unreasonably increase the probability and severity of injury. *Id.* at 358. In the process of reaching that conclusion, the court noted that "an employer who is aware that its contractor routinely ignores applicable federal guidelines and standard company policies related to safety may owe a duty to require corrective measures to be taken or to cancel the contract." *Id.* at 357.

In reaching its decision in *Mendez*, the court relied on its prior holding in *Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469 (Tex. 1985). The holding in *Tovar* is in keeping with the duty announced in *Mendez* because the contractor knew that the subcontractor was violating a specific provision of the contract that prohibited the use of the

4. Appellees also contend that Traylor can be held liable for lending Paige a defective piece of equipment—i.e., an arrow board which did not have a padlock or bolt through the hasp. However, the cage was a theft prevention device, not a safety device. Since the charac-

ter of the harm caused by the lack of a bolt or lock was not foreseeable, we decline to consider appellees' argument in the alternative. *See generally* W. Paige Keeton et al., Prosser and Keeton on The Law Of Torts § 43 (5th ed. (Lawyer's Edition) 1984).

kill line as a fill line on the blowout preventer. *Id.* The supreme court, noting that the contractor knew of this deviation, held that the contractor had negligently failed to exercise its right of control over the subcontractor. *Id.*

In this case, Jerry Williams, Traylor's traffic superintendent, testified he watched as the Paige crew rigged up the signboard behind its work vehicle:

> [Williams:] But, yeah, Bill [Van Buren, foreman of the Paige Barricades crew] had called me and met with me, and wanted to borrow one of our arrow boards—
>
> Question: All right.
>
> [Williams:]—and I said that was fine. And he would meet—him and the crew would meet me at the yard, they would pick up the arrow board, and he knew exactly where he was going and what he was going to do.
>
> Question: All right.
>
> [Williams:] I met him at the yard. They hooked the arrow board to the truck, hooked the chains up. I checked the board. Everything was—was operable, the lights on their truck was (sic) working, and they were ready to go.

Other testimony established that the bulky furnace designed to heat the thermoplastic was in the bed of the pickup truck when the Paige crew hooked up the arrow board. Therefore, it was evident that the crew would be working out of the back of the Paige truck. Shannon Hiller Hopkins, vice president of Paige, testified that this method of conducting a moving lane closure was Paige's standard practice. Hopkins further testified that Paige conducted moving lane closures on the U.S. 59 project once a week. Having established that Paige employees routinely conducted moving lane closures by connecting the arrow board directly to their work truck and that Traylor's traffic superintendent was aware of this practice, the question becomes whether Paige's practice ignored applicable safety guidelines and whether Traylor was aware of the safety violations such that it should have required corrective measures to be taken. *See Mendez,* 967 S.W.2d at 357.

■■■ The Manual on Uniform Traffic Control Devices ("MUTCD"), which was incorporated by reference into Traylor's contract with the state, and Traylor's contract with Paige, sets forth the guidelines applicable to the work being performed by the crew:

### 6F–10.3. Slow Moving Activities or Intermittent Stop Activities

Slow moving operations may involve such work as pavement marking or placement while intermittent stop operations may involve such work as pot hole patching. When performing such work on the roadway, a shadow vehicle should be used to warn traffic and protect workmen. Where feasible, advance warning signs should be placed along the roadway and periodically moved up as the work progresses. On low volume roads, a single vehicle equipped with signs, beacons and/or a flashing or sequencing arrow panel may suffice if there is good visibility.

### 6E–8. Advance Warning Arrow Panel Application

Placement of the arrow panel should be varied as needed to achieve the desired recognition distances. . . .

\* \* \*

For moving-maintenance activities where a lane is closed, it is preferable that the arrow panel be placed at the rear of the activity in the closed lane on a vehicle separate from the maintenance vehicle itself. The arrow panel should always remain upstream of the mainte-

nance vehicle where adequate recognition distance is available. . . .

The question posed in this case is whether connecting the arrow board directly to the work truck violated these guidelines given the nature of the work being performed, and, more importantly, whether Traylor Brothers was aware that those guidelines were being ignored.

Williams testified that Paige was working in compliance with the MUTCD. Both William Van Buren, the crew's supervisor, and Shannon Hiller Hopkins, Paige's vice president, also testified that the manner in which the moving lane closure was being conducted was in compliance with the state requirements. Karen Baker, a construction staff engineer with the Texas Department of Transportation, also testified that the manner in which Paige conducted the moving lane closure was in compliance with the MUTCD guidelines. Donald Barrett, Traylor's area superintendent, and Jerry Oliver, Traylor's safety manager, both testified that no disciplinary action was taken against Traylor by the investigating governmental authorities concerning the accident. Shannon Hiller Hopkins also testified that the Occupational Safety and Health Administration ("OSHA") did not issue a citation to Paige for failure to use a second truck in connection with the moving lane closure. Karen Baker testified that if the Department of Transportation believed that Paige had been operating outside departmental guidelines, Traylor would have been notified, and Traylor would have been required to notify Paige.

The only witness who testified that a second truck should have been used in conducting the moving lane closure was James Wallace, the plaintiffs' expert witness. Wallace testified that the arrow board should have been attached to a truck other than the work truck. The truck with the arrow board would be considered a shadow vehicle, and the shadow vehicle would have followed behind the work truck. Wallace admitted his testimony contradicted the testimony offered by Karen Baker. Wallace also admitted that the Department of Transportation for which Baker worked was the agency responsible for interpreting the MUTCD. Wallace further admitted that nothing critical was said about Traylor in any report by OSHA, the State of Texas, or the Houston department, each of which investigated the accident.

Even if we were to assume that Paige had violated the MUTCD guidelines by failing to use a second truck in its moving lane closure, Traylor was not aware that a violation existed. The duty under *Mendez* would only arise if Traylor was "aware" that Paige was routinely ignoring applicable safety guidelines. *Id.* at 357. There is no evidence in this record of any such awareness; therefore, the *Mendez* duty is not applicable.

CONCLUSION

Traylor did not owe a duty to Alaniz under the facts of this case. The trial court's judgment is reversed and judgment is rendered that the appellees take nothing with respect to their claims against Traylor.

PHIL HARDBERGER, Chief Justice, dissenting, joined by Justice LÓPEZ, Justice STONE, and Justice EVANS.

Although the question of whether a duty exists ordinarily is a question of law, in some instances it may require the resolution of disputed facts or inferences which are inappropriate for legal resolution. *See, e.g., Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 395 (Tex. 1991); *Mitchell v. Missouri–Kansas–Texas R.R. Co.,* 786 S.W.2d 659, 662 (Tex.

1990); *Central Power & Light Co. v. Romero*, 948 S.W.2d 764, 766 (Tex.App.—San Antonio 1996, writ denied). A jury question will arise when "the existence of a duty depends upon the factual setting and the interplay of factual and legal questions.' " *See Mitchell*, 786 S.W.2d at 662. This is such a case.

The majority initially rejects the argument that Traylor is liable based on its right of control. However, Williams, Traylor's traffic superintendent, testified that Traylor was in charge of moving lane closures depending upon the length of time that was involved. The testimony was conflicting with regard to the length of time the Paige employees would have been conducting the moving lane closure had their work not been interrupted. This conflicting evidence raises a question of fact as to whether Traylor had a right to control the moving lane closure Paige was conducting.

The majority also rejects the argument that Traylor was liable because it was aware that Paige was routinely violating safety guidelines by directly connecting the arrow board to the work truck for use as a moving lane closure. The evidence as to whether Paige's actions violated the guidelines and whether Traylor knew or should have known of the violation is in conflict. James Wallace, the plaintiffs' expert, testified that the manner in which Paige conducted the moving lane closure violated the guidelines. The State was paying Traylor approximately $1 million for traffic control. Does this not imply some legal duty on Traylor to see that it is done safely? Traylor was permitting Paige to use its arrow boards with actual knowledge of the manner in which the

arrow boards were being used. Williams, Traylor's traffic superintendent, watched Paige connect the arrow board to the work truck on the night Alaniz was killed and later observed Paige employees conducting the moving lane closure. In *Mitchell*, the Texas Supreme Court held: "Whether or not the railroad knew or should have known that ice had formed on the steps and grab irons of the engine is, when the evidence is in conflict, the type of issue which is properly and best resolved by the finder of fact." 786 S.W.2d at 662. Similarly, given the conflicting evidence presented in this case, whether or not Traylor knew or should have known that Paige was violating safety guidelines is "the type of issue which is properly and best resolved by the finder of fact." *Id.*

The majority ignores the disputed facts and inferences which give rise to a jury question as to whether a duty exists. As Chief Justice Phillips recently stated in *Lozano v. Lozano:*

> Circumstantial evidence often requires a fact finder to choose among opposing reasonable inferences. And this choice in turn may be influenced by the fact finder's views on credibility. Thus, a jury is entitled to consider the circumstantial evidence, weigh witnesses' credibility, and make reasonable inferences from the evidence it chooses to believe.

44 Tex.Sup.Ct.J. 171, 175, 2000 WL 1826568, at * 18 (Tex. Dec. 14, 2000) (Phillips, C.J., concurring and dissenting) (citations omitted).[1]

Because I believe the issue of duty was properly submitted to the jury, and the

---

1. The December 14, 2000 opinion was superseded on rehearing. The quoted language remains unchanged in the new opinion. See *Lozano v. Lozano*, 44 Tex. Sup. Ct. J. 499, 503-04, 2000 WL 33216152, at *18, ―― S.W.3d ――, ―― (Tex. Mar. 8, 2001) (Phillips, C.J., concurring and dissenting).

jury's answers were properly buttressed by evidence, I respectfully dissent.