**Opinion issued June 1, 2023**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

## NO. 01-22-00434-CV

———————————

## METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS, Appellant

## V.

## TRANS-GLOBAL SOLUTIONS, INC., Appellee

---

### On Appeal from the 190th District Court
### Harris County, Texas
### Trial Court Case No. 2017-74242

---

### MEMORANDUM OPINION

Appellant, Metropolitan Transit Authority of Harris County, Texas ("Metro"),

challenges the trial court's rendition of summary judgment in favor of appellee,

Trans-Global Solutions, Inc. ("TGS"), in Metro's suit against TGS for, among other

things, negligence, negligence per se, and gross negligence. In two issues, Metro contends that the trial court erred in granting TGS summary judgment.

We affirm.

## Background

In Metro's sixth amended petition, it alleged that "[o]n August 31, 2016, [Augustin Cruz] Melendez," who was working for TGS's subcontractor, A. Morfin Trucking, LLC ("Morfin"), was driving "a dump truck southbound at the 4500 block" of Martin Luther King Jr. ("MLK") Boulevard in Houston, Harris County, Texas. When Melendez reached the intersection of MLK Boulevard and South MacGregor Way, he "illegally ran a red light and attempted a prohibited U-turn." The dump truck "struck a [Metro] train, causing substantial damage" to the "train, axel counter box and bar signal."

Under the subcontract between TGS and Morfin (the "TGS-Morfin subcontract"), Morfin had agreed to "furnish all labor, materials, equipment and other facilities required to . . . [p]rovide [t]ruck units to haul off clay dirt" from the "Brays Bayou Channel Modification" project to a designated landfill. The TGS-Morfin subcontract required that the trucks used for the project "comply with [Texas Department of Transportation ('TXDOT')] regulations, [as well as] Harris County and [C]ity of Houston traffic regulations." The TGS-Morfin subcontract also required that the hauling work be "performed in accordance with the prime

2

contract" between TGS and the Harris County Flood Control Drainage District ("HCFCD") "and in accordance with all plans, specifications and other contract documents attached to or incorporated into the prime contract." And the TGS-Morfin subcontract declared that Morfin was "responsible for any damage and repairs caused by trucks to public roads, streets, and bridges."

Metro further alleged that the prime contract between TGS and HCFCD contemplated "clearing," "grubbing," and "excavating approximately 490,000 [c]ubic [y]ards of material with off-site disposal" in order to "widen the Brays Bayou channel from Lidstone [Street] to Calhoun [Road]" in Houston with the goal of "decreasing the frequency of flooding" in the area. Metro alleged that "[a]s [the] general contractor at the [project] site, [TGS] had a duty to make sure all of its employees and subcontractors performed their duties in a safe and prudent manner." The prime contract required TGS to "comply with all [municipal] laws, ordinances, and regulations in any manner affecting the conduct of the work, including observing traffic control devices," "inspect the [project] site and ascertain whether any health or safety hazards existed" before beginning work, "and not allow" anyone to perform "services at the [project] site until they were notified of th[o]se rules and regulations." But, according to Metro, TGS's safety personnel "failed to perform a comprehensive safety inspection of the [project] site" before and during the project.

3

Metro also alleged that the prime contract "required [TGS] to provide a [flagger] and traffic control plan in and around the [project] site" and it "prohibited [TGS] from allowing work requiring a license to be performed by a worker who [did] not have the proper license." But TGS "never obtained a [t]raffic [c]ontrol [p]ermit for the [project] site, never submitted a traffic control plan or a designated haul route to the City," and did not "use any [u]niform[ed] [p]eace [o]fficers at the [project] site as required by" municipal ordinance. TGS instead "unlawfully used untrained laborers" as flaggers to direct traffic into and out of the project site from "MLK Boulevard, a major public roadway." Metro noted that, according to Melendez, "all of the dump truck drivers who were hauling from the [project] site made the same illegal [U-]turn" that he made before colliding with the Metro train. And Metro maintained that the flaggers used by TGS were "positioned to see all truck drivers, including Melendez, making illegal U-turns" at the intersection of MLK Boulevard and South MacGregor Way, yet they "did nothing to correct" the truck drivers' "unsafe practices."

Metro further alleged that TGS knew that the truck drivers were compensated by the load for hauling soil from the project site and thus it had a duty to ensure that the drivers "complied with traffic signals," "monitor[ed] whether" the drivers were "making illegal U-turns over Metro's rail tracks at the intersection of [South] MacGregor Way and MLK [Boulevard]" and, if so, to "stop[] the practice." "If

4

[TGS] had complied with the [prime contract]" and municipal ordinances, an "off-duty peace officer would have recognized the danger and prevented" the truck drivers "from making illegal U-turns" at the intersection of MLK Boulevard and South MacGregor Way.

Metro brought claims for negligence, negligence per se, and gross negligence against TGS.[1]  According to Metro, TGS was negligent in failing to, among other things, "properly assess a dangerous condition" at the intersection of MLK Boulevard and South MacGregor Way, "instruct [the] truck drivers not to violate traffic control laws at or near the [project] site," "have an off duty peace officer directing traffic at the [project] site," "have a [t]raffic [c]ontrol [p]lan" and "obtain a [t]raffic [c]ontrol [p]ermit" for the project site, "have a designated haul route for [the truck drivers] to follow," "confine . . . traffic to designated haul routes," and "properly assess the area near the [p]roject [site] for traffic and safety concerns."

Metro also maintained that TGS was vicariously liable for Melendez's negligent acts because TGS "had the right of control over [Melendez]."  TGS "had the right to assign tasks and control the details" of Melendez's work "at or near the [project] site," and specifically, "the right to confine Melendez's travels as well as

---

[1]      Metro also brought a fraud claim against TGS but did not appeal the trial court's rendition of summary judgment in favor of TGS on that claim.  Thus, nothing in this memorandum opinion disturbs the trial court's rendition of summary judgment in favor of TGS on Metro's fraud claim.

[direct] traffic to a [d]esignated [h]aul [r]oute." And TGS's alleged "right of control over Melendez" made him "an employee" or a "borrowed employee" of TGS.

As to its negligence per se claim, Metro asserted that TGS was negligent per se in failing to have a qualified flagger, a traffic control plan for the project site, or a traffic control permit at the project site "as required by the [City of Houston] and the [prime contract]."

In asserting that TGS was grossly negligent, Metro alleged that TGS "had subjective awareness of the risk involved" in using an unskilled laborer instead of a qualified flagger, in failing to have a traffic control plan or a designated haul route, and in "[f]ailing to advise" the truck drivers "not to make U-turns at the [intersection of] South MacGregor Way [and MLK Boulevard]." Yet, despite its awareness, TGS "nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others."

According to Metro, the negligent acts and omissions by TGS, both directly and for Melendez's conduct under a respondeat superior theory, proximately caused the collision between Melendez's truck and the Metro train and caused Metro damage. Metro sought actual damages of $1,107,384, which included Metro's cost to repair its train, the loss of the train's use during the repair period, the cost to repair the axle counter box, and the worker's compensation benefits paid to its train operator. Metro also sought exemplary damages not to exceed $10 million.

TGS answered, generally denied Metro's allegations, and it specifically denied that it "owe[d] a legal duty such that it would be responsible for [Melendez's] actions" or "a duty to ensure that Melendez, an independent contractor, performed his work safely." It also specifically denied that it was aware that "Melendez or any other truck drivers routinely made illegal U-turns" at the intersection of MLK Boulevard and South MacGregor Way or that it had any control over "the means, methods or details of [Melendez's] work" or any control over Melendez at the intersection of MLK Boulevard and South MacGregor Way, which was "more than 800 feet away" from the project site. TGS noted that the TGS-Morfin subcontract "specifically provided that [the] [t]rucks transporting dirt from Brays Bayou must comply with all TXDOT regulations[] [as well as] Harris County and [municipal] traffic regulations." (Internal quotations omitted.)

Further, TGS asserted that it was "entitled to a reduction, an offset, or [a] bar to any recovery by Metro" as provided in Texas Civil Practice and Remedies Code section 33.001, "as well as to a determination of comparative causation, contribution and/or indemnity plans." TGS also invoked "all rights and limitations" set forth in Texas Civil Practice and Remedies Code chapter 41.

TGS then moved for summary judgment, asserting that it was entitled to judgment as a matter of law on Metro's negligence, negligence per se, and gross negligence claims and there was no evidence to support Metro's negligence,

7

negligence per se, and gross negligence claims. In its amended summary-judgment motion, TGS explained that it had contracted with Morfin "to provide trucks and independent contractors to haul off dirt from the [project] site." Morfin, "in turn, [had] hired Melendez as an independent []contractor." The TGS-Morfin subcontract provided that the dump "[t]rucks transporting dirt from [the project site] must comply with TXDOT regulations, Harris County and [municipal] traffic regulations," and under the TGS-Morfin subcontract, Morfin was "responsible for any damage and repairs caused by trucks to public roads, street[s], and bridges."

As to Metro's negligence claim against it, TGS asserted that Metro had no evidence that TGS owed it any legal duty, breached any duty, or that any breach of duty proximately caused Metro's damages. Also, according to TGS, no evidence showed that it had a right of control over Melendez, an independent contractor, and there was "no genuine issue of material fact" that TGS owed Metro "a duty such that it would be responsible for Melendez's actions" at the intersection of MLK Boulevard and South MacGregor Way. As an independent contractor and the holder of a commercial driver's license, Melendez "had a responsibility to obey all traffic signs, traffic laws, and traffic regulations" and "to determine what route [he] would use to get to the [project] site." No one from TGS told any of the truck drivers how to operate their trucks, "told Melendez it was acceptable to make the illegal U-turn at the intersection," or told Melendez "that he did not need to follow the traffic

8

signs." Thus, TGS "did not control the means, methods, or details of Melendez's work in driving his truck, and especially had no control over Melendez" at the intersection of MLK Boulevard and South MacGregor Way, which was "more than 800 feet away from the [project] site." Further, TGS asserted that there was no evidence that anyone "from [TGS] knew that Melendez or any [of the dump] trucks were making illegal U-turns" at the intersection. TGS also argued that Metro could not recover under a negligence per se theory because it did not and could not plead that TGS "violated a specific statute." And as to Metro's gross-negligence claim, there was no genuine issue of material fact that TGS "had an actual, subjective awareness of any risk involving Melendez making an illegal U-turn" at the intersection of MLK Boulevard and South MacGregor Way.

In its summary-judgment response, Metro asserted that the prime contract "expressly required TGS to observe and comply with all [municipal] laws, ordinances and regulations in any manner affecting the conduct of the work, including observing traffic control devices," "to inspect the [project] site" before beginning work "to determine the existence of safety hazards," "to bar any subcontractor at the [project] site until all were notified of all rules and regulations," and "to provide a flagman and [t]raffic [c]ontrol [p]lan in and around the [project] site." But "TGS had no [t]raffic [c]ontrol [p]lan or [t]raffic [p]ermit for the [project] site," and it did "not employ off-duty uniform peace officers to manage traffic at the

construction site as required by City of Houston Ordinance No. 2004-798 and City of Houston Traffic Control Personnel Ordinance Regulations and Guidelines."

According to Metro, "[i]f TGS had followed" the municipal "ordinances and regulations and employed an off-duty peace officer to direct [the] trucks" into and out of the project site from MLK Boulevard, the "officer would have recognized the danger" of the truck drivers' "illegal U-turns and put a stop to the practice before Melendez drove his truck into the train." Further, "TGS's Safety Coordinator and Safety Manager failed to properly inspect the area around the [project] site, including traffic control devices at the intersection [of MLK Boulevard and South MacGregor Way]."

For the proposition that TGS had the "right to control where Melendez operated his truck," Metro cited what it described as a "City of Houston Construction Traffic Regulation," which purportedly "provided TGS with the authority and duty to provide all [truck drivers] servicing the [project] site with a 'designated haul route.'"[2] Metro argued that TGS was negligent because it "failed to have a

_____

[2] The document cited by Metro, which it attached as Exhibit A to its summary-judgment response, has a page heading that states: "City of Houston Standard General Requirement," "Section 01555 Traffic Control And Regulation." (Emphasis omitted.) Metro did not identify the source of the document, but it appears to be part of a Houston Public Works publication titled "Standard Construction Specifications for Wastewater Collection Systems, Water Lines, Storm Drainage, Street Paving, and Traffic." *See* City of Houston, Houston Public Works, *Standard Construction Specifications for Wastewater Collection Systems,*

10

designated haul route despite knowing that hundreds of dump trucks would be entering and leaving the [project] site along MLK [Boulevard]."

After a hearing, the trial court granted TGS summary judgment on Metro's negligence, negligence per se, and gross-negligence claims. Metro then filed an amended motion for new trial, which the trial court denied. After Metro settled with the remaining defendants, the trial court signed an order disposing of all remaining claims, making its order granting TGS summary judgment final.

**Standard of Review**

We review a trial court's decision to grant summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

*Water Lines, Storm Drainage, Street Paving, and Traffic* (2021), https://www.houstonpermittingcenter.org/media/3776/download.

11

To prevail on a no-evidence summary-judgment motion, the movant must establish that there is no evidence to support an essential element of the non-movant's claim on which the non-movant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.— Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the non-movant to present evidence raising a genuine issue of material fact as to each of the elements challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524. A no-evidence summary-judgment may not be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements in the motion. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (internal quotations omitted). The trial court must grant a no-evidence summary-judgment motion if the movant asserts that there is no evidence of one or more specified elements of the non-movant's claim on which the non-movant would have the burden of proof at trial and the non-movant fails to file a timely response or fails to produce summary-judgment evidence raising a genuine issue of material fact on each challenged element. *See* TEX. R. CIV. P.

12

166a(i); *Lockett v. HB Zachry Co.*, 285 S.W.3d 63, 67 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

To prevail on a matter-of-law summary-judgment motion, a movant has the burden of establishing that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). To satisfy that burden, the movant must either: (1) disprove at least one essential element of the plaintiff's cause of action, or (2) plead and conclusively establish each essential element of an affirmative defense. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). Once the movant meets its burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment. *See Siegler*, 899 S.W.2d at 197; *Transcont'l Ins. Co. v. Briggs Equip. Tr.*, 321 S.W.3d 685, 691 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

## Summary Judgment

In its first issue, Metro argues that the trial court erred in granting summary judgment in favor of TGS on Metro's negligence and negligence per se claims because it presented evidence that raised a genuine issue of fact.

13

## A. Negligence

In a portion of its first issue, Metro argues that the trial court erred in granting summary judgment in favor of TGS on Metro's negligence claim because it provided evidence to establish each element of its negligence claim.

A negligence cause of action has three elements: (1) a legal duty, (2) breach of that duty, and (3) damages proximately resulting from the breach. *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022); *Watanabe v. Summit Path Partners, LLC*, 650 S.W.3d 112, 125 (Tex. App.—Houston [1st Dist.] 2021, no pet.). The threshold inquiry in a negligence case is whether a duty exists, which "is a question of law for the court to decide from the facts surrounding the occurrence in question." *Elephant Ins. Co.*, 644 S.W.3d at 144 (internal quotations omitted).

According to Metro, TGS owed it a duty to control the conduct of Melendez, an independent contractor, because TGS retained a contractual right to manage and control traffic around the project site and thus, to ensure that Melendez performed his work safely.

A general contractor typically does not owe any duty to ensure that an independent contractor performs its work in a safe manner. *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 & n.1 (Tex. 1999); *Torres v. Pasadena Ref. Sys., Inc.*, No. 01-18-00638-CV, --- S.W.3d ---, 2022 WL 17684333, at *5 (Tex. App.—Houston [1st Dist.] 2022, no pet.). But a duty may arise if the general contractor retains some

14

control over the manner in which an independent contractor performs his work. *Elliott-Williams Co., v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999); *Traylor Bros., Inc. v. Garcia*, 49 S.W.3d 430, 434 (Tex. App.—San Antonio 2021, pet. denied). The right to control can arise either through a contractual obligation or through the actual exercise of control.[3] *Diaz*, 9 S.W.3d at 804; *Garcia*, 49 S.W.3d at 434.

"Determining whether a contract gives a right of control is generally a question of law for the court rather than a question of fact for the jury." *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). The right to control must be more than "a general right to order the work to start or stop, to inspect progress or receive reports." *Id.* (internal quotation omitted); *see also Chapa*, 11 S.W.3d at 156 (general contractor "must have some latitude to tell its independent contractors what to do, in general terms, and may do so without becoming subject to liability"). Instead, the right to control must relate to the condition or activity that caused the injury, and the contract must grant the general contractor at least the right to control "the means, methods, or details of the independent contractor's work such that the contractor is not entirely free to do the work in [its] own way." *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020) (internal citation and quotations omitted). If a contractual right to control an independent contractor's work exists, a duty arises

---

[3] Metro, in its briefing, does not assert that TGS had "actual control," but that TGS had a "contractual right and obligation."

15

even if no actual control is exercised. *Id.* Thus, we consider whether TGS contractually retained a supervisory right over the means, methods, or details of Melendez's work such that Melendez and Morfin were not entirely free to do the work in their own way. *See id.*; *Chapa*, 11 S.W.3d at 155.

Metro identifies provisions in what it describes as the prime contract as giving rise to TGS's right to manage and control the details of Melendez's driving near the project site and a commensurate legal duty owed to Metro. But two of the documents that Metro cites do not appear to be part of the prime contract.[4] Because the trial court could not have properly considered them as giving rise to a contractual duty of care, we do not consider them here.

Metro also relies on Exhibit K to its summary-judgment response, which contains amendments to the "General Provisions" of the prime contract. Those

---

[4]    Metro cites to Exhibit H to its summary-judgment response, which is a document apparently generated by TGS, which is titled "Contractor Safety Expectations." The "goals" section of the document explains that TGS's goal is to maintain a "safe work environment" in its "work with Harris County Counties [sic] Municipal Utility District No. 3." This document, on its face, does not apply to the "Brays Bayou Channel Modification" project. Metro also cites to Exhibit I to its summary-judgment response, which is a TGS "publication" titled "Responsibilities" that "contains the minimum requirements for TGS personnel" in "providing a safe workplace for its employees and [s]ubcontractors." Metro does not explain how Exhibit I might otherwise support its negligence and negligence per se claims against TGS. *See JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 867 (Tex. 2021) ("A general contractor that promulgates mandatory safety requirements and procedures owes only a narrow duty to ensure that those requirements and procedures do not unreasonably increase, rather than decrease, the probability and severity of injury." (internal quotations omitted)); *see also Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 156 (Tex. 1999).

16

"General Provisions," among other things, state that "contractors are advised that it shall be their responsibility to determine if any portion of these [s]pecifications are affected by any existing federal, state or city laws." (Emphasis omitted.) Exhibit L, attached to Metro's summary-judgment response, is a supplement to the prime contract's "General Requirements," which provides that the

> contractor shall provide flagmen and traffic control as required for public safety and local ordinances. Traffic signs and barricades shall be in accordance with the Texas Manual on Uniform Traffic Control Devices. No separate pay for flagmen or traffic control shall be made by HCFCD.

(Emphasis omitted.)[5] Metro asserts that this provision of the prime contract incorporates by reference local ordinances that require "personnel necessary to protect the [w]ork and public."

Metro has not identified any ordinance requiring TGS to designate haul routes for Morfin's truck drivers.[6] For the general provision requirement that TGS "provide flagmen and traffic control as required for public safety and local ordinances," Metro refers to a municipal ordinance providing that:

---

[5] Metro also cites to a budget line item for a "railroad flagger" in TGS's bid for the project, which, to the extent that "railroad flagger" means the same thing as "flagm[a]n or traffic control," appears to be at odds with the supplement to the prime contract's exclusion of separate pay for flagmen, as quoted above. In any event, the prime contract makes no mention of a "railroad flagger," so the proposed budget line item does not affect our analysis of whether the prime contract gave TGS a contractual right of control over the details of Melendez's work.

[6] Metro relies on the Houston Public Works publication described in footnote 3. *See supra*.

17

During the hours between 6:00 a.m. and 7:00 p.m. on any Monday, Tuesday, Wednesday, Thursday, or Friday, other than a holiday observed by the closure of city offices, it shall be unlawful within the [C]ity [of Houston] . . . [f]or any person other than a peace officer to conduct or engage in traffic direction.

Houston, Tex., Code of Ordinances ch. 45, art. XVIII, § 45-452(a)(1). According to Metro, because TGS did not have a qualified flagger, it failed to notice that the dump truck drivers were making U-turns at the intersection of MLK Boulevard and South MacGregor Way despite signage prohibiting trucks from making U-turns.[7] The flaw in this position, though, is that it wrongly presumes TGS had a duty to monitor whether the truck drivers were making illegal U-turns over Metro's rail tracks at the MLK Boulevard and South MacGregor Way intersection—over 800 feet from the project site—and correct their driving. As Metro notes, Genevieve Johnson, TGS's safety coordinator, testified in her deposition[8] that TGS had the right to direct or control the details of how the truck drivers operated their trucks "[o]n [the project]

_____

[7]    As exhibits to its summary-judgment response, Metro attached certain affidavits in which individuals offered their purportedly expert opinions as to whether TGS had a duty to provide a designated haul route, a uniformed peace officer as a flagger, and other traffic control measures. The trial court did not rule on TGS's objections to those affidavits. But to the extent that they seek to apply the law to undisputed facts, they are not entitled to any weight. Courts—not witnesses, expert or otherwise—decide the law applicable to a case. *See Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 95 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Ledbetter v. Mo. Pac. R.R.*, 12 S.W.3d 139, 144 (Tex. App.—Tyler 1999, pet. denied); *see also* TEX. R. EVID. 702 (qualified expert may testify if testimony "will help the trier of fact to understand the evidence or to determine a fact in issue").

[8]    Metro attached the deposition of Johnson to its summary-judgment response as Exhibit E.

18

site." But Johnson denied that TGS had a right to control any independent contractors more than twenty-five feet away from the project site, and nothing in the prime contract or the TGS-Morfin subcontract supports a different conclusion.[9] Instead, the TGS-Morfin subcontract required Morfin's "[t]rucks transporting dirt" to "comply with TXDOT regulations, Harris County and [municipal] traffic regulations" and declared that Morfin was "responsible for any damage and repairs caused by trucks to public roads, street, and bridges." These provisions of the subcontract make clear that Morfin and its commercially licensed truck drivers bore the responsibility for safely operating their trucks on public streets.

We conclude that neither the prime contract nor the TGS-Morfin subcontract imposed any duty on TGS to control the way that Melendez drove when he was not at the project site. Thus, we hold that the trial court did not err in granting summary judgment in favor of TGS on Metro's negligence claim based on the absence of a right to control and thus no legal duty.

We overrule this portion of Metro's first issue.

---

[9] To the extent that Metro argues that TGS owed it a duty of care because it should have known that Melendez and other dump truck drivers, while off-site, were making illegal U-turns at the intersection of MLK Boulevard and South MacGregor Way, Texas law does not support the imposition of a duty under such circumstances. *See Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 609 (Tex. 2002) ("[W]e have never concluded that a general contractor actually exercised control of a premises where . . . there was no prior knowledge of a dangerous condition and no specific approval of any dangerous act.").

19

**B.    Negligence Per Se**

In another portion of its first issue, Metro argues that the trial court erred in granting summary judgment in favor of TGS on its negligence per se claim because Metro "pleaded an extensive list of TGS's violations" and TGS "presented no evidence that it complied with the requirements" or ordinances.

"Negligence per se is a common-law doctrine that allows courts to rely on a penal statute to define a reasonably-prudent-person's standard of care." *Reeder v. Daniel*, 61 S.W.3d 359, 361–62 (Tex. 2001); *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 93 (Tex. App.—Houston [1st Dist.] 2003, no pet.)  To establish negligence per se, a plaintiff must prove that: (1) the defendant's act or omission violates a penal statute or ordinance; (2) the injured person is within the class of persons that the statute or ordinance was designed to protect; and (3) the defendant's act or omission proximately caused the injury.  *Miranda v. TriStar Convenience Stores, Inc.*, No. 01-11-02073-CV, 2013 WL 3968337, at *6 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (mem. op.); *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 265 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also Reeder*, 61 S.W.3d at 362 ("In determining whether a penal statute provides the basis for a civil cause of action, we must consider whether recognizing such an accompanying civil action would be inconsistent with legislative intent.").

Metro did not allege or present any evidence that TGS's acts or omissions relating to the collision between Melendez's truck and the Metro train violate any penal statute and, as discussed above, it has not identified any ordinance that TGS violated. Because no evidence raises a fact issue as to the first element of Metro's negligence per se claim, we hold that the trial court did not err in granting summary judgment in favor of TGS on Metro's negligence per se claim. *See Reeder*, 61 S.W.3d at 361–62.

We overrule this portion of appellant's first issue.[10]

### Conclusion

We affirm the final order of the trial court.


Julie Countiss
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

---

[10] To the extent that appellant made other arguments in its first issue, we need not address them or its second issue based on our holdings. *See* TEX. R. APP. P. 47.1.